NEW ENGLAND MOTOR CO. v. B. F. STURTEVANT CO.

(Circuit Court of Appeals, Second Circuit. December 4, 1906.)

No. 30.

**1. PATENTS—ANTICIPATION—MOTOR FRAMES.**

The Burke patent, No. 631,518, for an improvement in frames for electric motors or generators, which consists in providing a frame or cradle in which the armature is mounted, and having bearings for the two ends of the axle, so as to preserve a perfect alignment, is void for anticipation by certain motors constructed for operating elevators which were in use prior to the application, and in which a similar cradle was used.

**2. SAME—ANTICIPATION—BURDEN OF PROOF.**

A public knowledge and use of a device by others prior to the application for a patent therefor being shown, the burden is cast upon the patentee to furnish convincing proof that the anticipation was anticipated by him in making the invention.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, §§ 65, 75.]

**3. SAME.**

The Bliss patent, No. 669,574, for a frame for electric motors is void for anticipation.

Appeal from the Circuit Court of the United States for the Southern District of New York.

For opinion below, see 140 Fed. 866.

This cause comes here upon appeal from a decree of the circuit court, Southern District of New York finding infringement of two patents for improvements in the frames of motors or generators. The first patent is to James Burke, August 22, 1899, No. 631,518, upon an application filed December 27, 1898; the first and third claims only being relied upon. The second patent is to Donald M. Bliss, No. 669,574, March 12, 1901, upon an application filed February 19, 1900; the first, second, and fifth claims only being relied upon.

Benjamin Phillipps and E. P. Howe, for appellant.

C. V. Edwards, for appellee.

Before LACOMBE, TOWNSEND, and COXE, Circuit Judges.

LACOMBE, Circuit Judge. The Burke patent states that the invention relates to electric motors or generators, and "has particular reference to the frames thereof." It proceeds as follows:

"The object of the invention is to construct a machine in which the armature shall be concentrically placed in the magnetic field in perfectly-aligned bearings, which latter shall be permanent and not liable to displacement by use of the machine or other cause. In machines heretofore constructed much difficulty has been experienced by reason of the bearings becoming displaced with respect to the frame, thereby shifting the armature out of its proper position in the field and affecting the alignment. This difficulty is usually encountered in reassembling the machine after the parts have been once separated and the bearings and armature removed. It is desirable that the armature should at all times be concentrically placed in the magnetic field, and that the bearings supporting the armature should at all times be in perfect alignment with each other. It is further desirable that the armature be capable of being removed from the machine without being taken out of its bearings. I propose to obviate the difficulties above mentioned, and at the same time secure the advantages named by providing a frame or cradle in which the armature shall be adapted to be mounted; the frame being arranged to be secured in and form a part of the frame of the machine."

The above excerpts will be more readily understood when it is appreciated that in prior machines of this type there were separate bearings for the two ends of the armature axle, each bearing (through the bracket in which it was located) being separately attached to the frame. In consequence more work was required to adjust them in assembling the machine in the shop, so as to fasten the bearings and other parts in proper position. It was sometimes necessary to take the machine apart, for cleaning, repairs, or other purposes and when reassembling was undertaken by persons, not as skillful mechanics as those who made it, there was a chance that the bearings might not be replaced precisely where they should be. The substitution of a single "cradle" in which both bearings are located for two separate brackets, each carrying a bearing, is the fundamental improvement above referred to, which overcame, measurably at least, the difficulties enumerated. Referring to the drawings, of which Fig. 2 represents an end view of the machine, the specification proceeds:

"3 represents the cradle or frame having bearings 4 and 5 [5 only is shown in this Fig. which is looked at end-on] in which the armature is adapted to be mounted. The bearings are preferably cast integrally with the cradle, but may be put on separately in any suitable manner. The bearings should be provided with renewable bearing boxes. The cradle may also be provided with other bearings—such for instance as 6—to support a counter-shaft to be used in connection with the armature-shaft through any suitable transmitting device. The form of the cradle is such that it will surround the frame of the machine as illustrated in Fig. 4 or will be adapted to be clamped between the parts 1 and 2 as illustrated * * * in Fig. 2. The latter form is the one which I prefer, and in this instance the cradle, or at least such parts of it as are clamped between the parts of the magnet-frame, should be of suitable magnetic conducting material, as such parts form part of the magnetic circuit.

"In order to facilitate the construction of the machine, I provide suitable faces for the cradle, against which the parts of the magnet-frame are adapted to be clamped. When the cradle is made to surround the magnet-frame as shown in Fig. 4, the frame may be provided with suitable supports [projecting from the sides of the frame]. * * * It will be understood that the invention is not limited for use with any particular type of machine and may be used with a machine having its magnet-frame composed of one or more parts.

I therefore desire it to be understood that I do not limit myself to the precise construction and arrangement of parts herein shown. It will be seen that the parts of the magnet-frame may be reversed with relation to the cradle or bearing-frame—that is, the part shown as the lower part in the drawings may be used as the upper part—and the machine thus reversed can then be readily attached to the ceiling."

The claims in controversy are:

"(1) In a motor or generator, the combination with the magnet-frame of the machine, of a cradle adapted to support the armature of the machine, and be supported by the magnet-frame, substantially as described."

"(3) In a motor or generator, the combination with the magnet-frame, of a cradle having a plurality of permanently mounted bearings for the armature-shaft said cradle being clamped to and supported by said magnet-frame, substantially as described."

The only defense which need be considered is anticipation alleged to be found in certain so-called Thomson-Houston motors running elevators in the city of Boston. The date of installation prior to Burke's date of invention is conceded, and one at least of them is still running. The machines with which Burke seems to have been especially concerned were small motors, such as are used for electric fans, ventilators, etc.; but, as seen above, he did not confine himself to any type, and is free to show infringement in any machine, however ponderous, which embodies his invention with such modifications only as ordinary shop-skill would be required to make in order properly to install a heavier machine than the one which patentee more particularly describes. A like rule must be applied in considering anticipating devices.

The following sketch represents the Thomson-Houston Motor:

1 is the cradle which supports the armature in its bearings. 4, 4, 4, 4 is one part or one-half of the magnet-frame wound with field coils, A, A. 5, 5, 5 is the other half or part of the same, wound with field coils B, B. Between these two parts of the magnet-frame is clamped the armature cradle by bolts, 6, 6, 7, 7, which may be compared with the bolts, x, x, y, y, of Fig. 2 of the patent. Referring to Fig. 2, it is apparent that, except for the purpose of locating it upon some base or support, the lower half of the magnet-frame (2) might be made precisely of the same shape as the upper half (1),

and it would fulfill all the functions which are assigned to it. The devising of appropriate means to connect it with its support is within the range of common shop expedients, the drawing shows an extension downward below the dotted line, and terminating in feet (12, 12) adapted to rest on the floor or base, and which may be secured thereto if it be desirable to secure the machine in some particular location, instead of moving it from place to place. The combination shown in the patent would be as efficient, if there were no extension below the dotted line and no feet, and the lower part of the magnet-frame were bedded in a concrete base. No other support for the magnet-frame than the extended feet is shown, nor any further support for the cradle than the magnet-frame itself. Apparently the drawing contemplates a machine of such a size that good workmanship in installation would not require the supplemental aid of additional supports. The man who had to install the ponderous Thomson-Houston motor, however—it weighs more than a ton—had to provide much sturdier supports for such a mass of metal; and he accomplished it in this way. Instead of extending the ends of the lower-half of the magnet-frame downwards so as to form legs integral with the frame, he built up heavy metal posts, 8, 8, from a metal base, 9, and on those posts rested the ends of the lower half of the magnet-frame, cutting recesses in the tops of the posts so that the heads of bolts, 5, 5, could enter therein and the lower-half of the frame rest squarely on the posts. Apparently to distribute weight and to meet the strain of the heavy cradle where it projected beyond the frame, he built up four additional posts two shown in the drawing (2, 2) and two just like them on the other side of the machine. It was convenient to secure the entire machine against any sidewise play by bolting the cradle frame into the tops of these posts, 2, 2, 2, 2. Probably there are a number of convenient shop devices which would have secured the same result by using the posts, 8. One or more dowel pins or upwardly projecting lugs on each post, 8, fitting snugly into holes in the lower half-frame would apparently have accomplished it; but the enormous weight of the Thomson-Houston machine called for extra strong fittings, and it may well have been important to use the four posts instead of the two.

Of course mere modifications in the details of setting-up the combination of the patent in the place where it is to do its work are immaterial unless they affect in some way the operation of such combination. A mere casual inspection of the model of the Thomson-Houston motor, which the complainant put in evidence, and which is correctly shown in the above drawing, shows that it has the several parts, performs the functions, and appears to be a substantial reproduction of the combination of the patent.

The various objections which complainant makes to its being considered an anticipation may next be examined.

1. It is suggested that the "armature of the Thomson-Houston motor cannot be magnetically centered as in the Burke patent. To adjust the position of the armature frame the machine would have to be separated from its base, and all its parts separated from each other. This would

preclude operation of the machine while finding the magnetic center. In Burke's device, it is only necessary to slide the armature cradle a little one way or the other while the machine is running." This suggestion presupposes the assumption that the cradle, where it is clamped between bolts, x, x, y, y, has some lateral play. Whether x and y indicate separate bolts, or merely the two ends of the same bolt, is not quite clear; in either event, however, lateral play of the cradle could be secured by making the hole in the cradle into which any x, y bolt passed larger than the diameter of the bolt, or extending it, at right angles to the axis of the bolt, by slots. This theory of lateral adjustment, however, is evidently an afterthought—and, in view of the language of the patents, not a particularly ingenious one—of the expert witnesses. The claims contain no reference to it, and there is not to be found in the specification a single phrase, or even a single word which suggests the faintest intimation of such a function. Fig. 2 supra shows the cradle clamped by bolts between the two halves of the magnet-frame, but it gives no indication as to the size of the holes in the cradle which those bolts enter. Fig. 3, however, shows the cradle, and the holes shown on either end of the bearing faces, 7 and 8, are evidently the holes into which the x, y bolts enter. There is nothing to indicate that they are large enough or of such elongated shape as to admit of any lateral movement of the cradle. When, moreover, we examine Fig. 4, which shows a modified form, in which the cradle surrounds the frame, instead of being clamped between its two halves, and the model, which both sides agree represents the Fig. 4 variety, we find that the cradle is so fixed in place with lugs or dowel pins as to preclude any lateral movement. Finally, such capacity for lateral movement is one of the things which Burke was seeking to avoid. In assembling one of these motors, it is, as the evidence shows, a delicate piece of work to determine the magnetic center, and to locate the armature and its cradle properly in relation thereto. It requires the skill of one experienced in the art of the electrical engineer. When that is done, and the cradle (with its armature) is secured in its proper place, and the machine assembled and installed, it is desirable that it may live out its life of usefulness without having to call in the special skill which first assembled it, because it will be operated by persons who are not expert electrical engineers. The whole scheme of the patentee was to devise a combination of parts, which, when taken apart and reassembled, would always fit together, so as to secure at all times "perfectly-aligned bearings,   *   *   *   not liable to displacement by use of the machine or other causes." Burke expressly refers to liability to displacement due to re-assembling the machine after the parts have been once separated, and the evidence shows that it is necessary sometimes to take the machine apart in order to clean it. It is manifest that if the cradle were so arranged as to play laterally when the bolts, x, y, were loosened up, the chances of distortion from the magnetic center would be greater even than they were with the old double bracket structure. If the function now first suggested were incorporated in the machine which the specifications and drawings describe, it would wholly defeat the fundamental object of the inventor, as he himself states it.

2. It is suggested that the Thomson-Houston motor "does not have what is in any proper sense an armature cradle." It is not perceived, upon examination of the brief and the testimony, precisely what this statement means. Manifestly the motor has a frame or cradle, cast or forged in a single piece with bearings hollowed out in it to receive the axle ends of the revolving armature, and by reason of the fact that it is a single piece of metal the bearings are at all times in perfect alignment with each other. The axle ends are held in place by caps. The armature with its axle ends still in the bearings, may be removed simultaneously with the cradle which supports it. Why 1, 1 is not in every proper sense an armature cradle we are at a loss to understand.

3. It is suggested that the armature cradle is not "removable either practically or in any sense equivalent to the operation of the Burke cradle." Examination of the brief and testimony shows that this criticism is really to the effect that the Burke machine may be more readily taken apart than the Thomson-Houston motor. It would be a sufficient answer to such criticism to point out that nowhere in the claim or in the specifications is the facility of removability of parts declared to be a feature of the invention, except that it is said to be "desirable that the armature be capable of being removed from the machine without being taken out of its bearings." But, as is apparent on inspection of the Thomson-Houston model, they can be removed together, although, by reason of the additional supports required by the great weight of the motor, more bolts would have to be removed, and more power expended in lifting and turning before that result can be accomplished.

4. It is suggested that the "armature cradle is not reversible either practically or in any sense equivalent to the operation of the Burke cradle." It would unduly expand this opinion to show that this criticism is unsound, that, in fact, the parts of the Thomson-Houston magnet-frame may be reversed with relation to the cradle, and that—the size being reduced to admit of such a method of installation—it may be attached to the ceiling. It is a sufficient answer to the criticism to note that this reversibility of parts, although referred to in the specifications, is not made an essential part of the invention; that it is obtained by a particular construction and arrangement of parts; that the patentee expressly states that he does "not limit [himself] to the precise construction and arrangement of parts herein shown"; and that neither of the claims sued upon contains anything to indicate that it is intended to cover only reversible machines. A machine which should be in all other respects within the terms of the patent would be an infringement of these claims, even though, by reason of some detail of construction or arrangement of parts, it was not capable of being reversed and attached to a ceiling.

5. It is suggested that the Thomson-Houston motor is not within the claims, because the armature cradle is not supported upon the field magnet; the language of the first and third claims being "supported by the magnet-frame," and "clamped to and supported by said magnet-frame," respectively. This objection is hypercritical, and is based on the assumption that the posts, 2, 2, are the true supports of the machine, supporting the cradle frame which itself supports the parts of

the magnet-frame which are fastened to it by bolts, 6, 6, 7, 7. But, as seems evident from an inspection of the model and drawing, the posts, 2, 2, are really supplementary, required by the excessive weight of metal which has to be supported. The lower half of the magnet-frame does rest upon the top of the posts, 8, and is supported by them, and upon it rests the armature cradle, which is "clamped between the [two] parts of the magnet-frame." How that clamping is effected is immaterial, whether a threaded bolt couples the cradle to the parts so that they can only be separated by unscrewing, or whether a dowel pin is used which admits of their being separated by merely lifting one off the other is unimportant; such details are not incorporated into the claims. The specification says merely that the cradle is "arranged to be secured in and form a part of the frame of the machine." The Thomson-Houston motor is thus secured, and does form a part of the magnet-frame; moreover, it is "clamped between the parts of the magnet-frame," and so arranged that it lies upon the lower half of that frame, 5, 5, and receives support therefrom. The immateriality of the method of clamping will be apparent from a consideration of Fig. 2. If the parts were reversed (1 and 2 changing places), the machine could, as the specification says, "then be readily attached to the ceiling." If such attachment were effected by fastening the feet, 12, 12, to the ceiling, the parts would have to be held together by screws or by bolts with nuts; otherwise the machine would fall to pieces. If, however, it were attached to the ceiling by metal straps passing under 1 (now become the lower half), dowel pins might be used at the connecting faces. There can be no doubt that either arrangement would be equally within the patent. We are of the opinion that a motor like the Thomson-Houston, large though it be, would constitute an infringement of claims 1 and 3 and that, therefore, being earlier, it is an anticipation.

## The Bliss Patent.

It is not necessary to quote from the specifications of this patent or to construe its claims. The machine of the patent and the machine of defendant are identical. The only defense to be considered is prior public knowledge and use. The date of application is February 19, 1900. It is undisputed upon the proofs that a motor, known as the "Type B motor," and identical in construction with the motor defined in claims 1, 2, and 5 of the Bliss patent was constructed in the shops of the defendant in the early part of 1899 was satisfactorily tested in May, 1899, and was shipped to Wm. Cramp & Sons Shipbuilding Company for ventilating steering engine room on United States ship Alabama, on July 8, 1899. A public knowledge and use prior to the date of the application being thus clearly shown, the burden was upon the complainant to show that Bliss' invention was made at an earlier date. Complainant must "furnish the court with convincing proof that the anticipation has been anticipated." Westinghouse Elec. & M. Co. v. Saranac Lake Elec. L. Co. (C. C.) 108 Fed. 221. The complainant undertook to do this by the testimony of the patentee, Bliss. His story is: That he conceived the invention in 1894, made a rough sketch, and showed it to one De Luce (who was not called; his whereabouts

being unknown). That he took no further steps until early in the spring of 1898 when the idea of using a cradle support again occurred to him, and he made further sketches, and disclosed one of them about June 15, 1898, to Bickell, a fellow employé with the Holtzer-Cabot Electric Company, and, about the same time, showed a similar sketch to Holland, another fellow employé. These sketches are lost or destroyed. That in August, 1898, Bliss entered the employment of the defendant company, and was put in charge of the production of the electrical department, and the general supervision of that department, co-operating with the designers and draftsman (Balcom) to carry out any plans that might be necessary. That shortly after he entered the employ of defendant company he discussed the idea of using a cradle form of hanger with Blake, superintendent of the engine department. That immediately afterwards, and about the second week in August, 1898, a sketch was made and shown to Balcom, with instructions to lay out a detail drawing, embodying the cradle idea. That, as a result of his consultations with Balcom, the latter incorporated the cradle form of bearing support in the new Type B motor. That he had frequent interviews with Balcom on the subject. That after the first motor of Type B had been tested and found satisfactory, so far as the cradle type of bearing hanger was concerned, he suggested to Foss, the general manager, and to Snow (manager of Advance Department, who attended to matters relating to the publicity and promotion of the business) the advisability of applying for patents to cover this cradle design. That he did nothing further in the matter until after he left defendant's employment, when he redesigned the cradle type of bearing support, adding a longitudinal adjustment, and applied for patent.

Bickell, Holland, Blake, Balcom, Foss, and Snow, all testified, as did also Admiral Bowles, Naval Constructor, who stated that he suggested to employés of defendant company, before the constructoin of the Type B motor, that the armature bearings should be contained in one piece or construction, so that the difficulties of realignment in the course of repairs would not occur. It would subserve no useful purpose to discuss the details of this evidence. The testimony of the first two witnesses, testifying to their recollection of sketches looked at casually five years before was corroborative of Bliss, although one of the witnesses seems to have had an imperfect recollection of the sketch he saw, saying that it disclosed a detail of construction which Bliss says he conceived later. None of the other witnesses support his story, and some of them flatly and positively contradict him. It is sufficient to say that, upon the whole case, we are not satisfied that the evidence is sufficient to anticipate the anticipation, and that the patent must be held void.

The decree of the Circuit Court is reversed, with costs and the cause remanded to the Circuit Court, with instructions to dismiss the bill, with costs.