## LOWE v. PACIFIC GAS & ELECTRIC CO.

(District Court, N. D. California, S. D. September 23, 1924.)

No. 550.

**1. Equity ⬨⟹409—Findings of master, though not binding, entitled to great consideration.**

Where a reference is made, without consent and against protest, though the findings of the master are perhaps not binding on the court, they are entitled to great consideration, when based on conflicting testimony of witnesses examined before him.

**2. Patents ⬨⟹328—Lowe, ———, for improvement in gas-making apparatus, held invalid.**

The Lowe patent, No. ———, for an improvement in apparatus for making gas from crude oil and steam, *held* invalid for want of reasonable diligence of the patentee in reducing the invention to practice, and anticipation by another, who in the meantime had independently conceived the invention and put it into practical use.

---

[1] Opinion not available, but see Table of Cases in subsequent volumes.

**3. Patents ⬤⇒30(1)—Invention must be completed by reduction to practice.**

An invention in the sense of the patent law signifies a completed invention, either by actual reduction to practice or by the filing of an application in conformity with the statute.

**4. Patents ⬤⇒90(2)—Inventor must use due diligence in reduction to practice.**

The two-year provision in Rev. St. § 4886 (Comp. St. § 9430), does not excuse lack of due diligence in completing an invention by reduction of the conception to practice, as against intervening rights of another, who not only independently conceives the invention, but reduces it to practice during the interval between its first conception and reduction to practice.

**5. Patents ⬤⇒261—Patentee held estopped to claim infringement.**

A patentee *held* estopped to recover for infringement from a defendant, who had used the invention for 15 years with the patentee's knowledge before he made any claim of infringement.

In Equity. Suit by Leon P. Lowe against the Pacific Gas & Electric Company. Decree for defendant.

John H. Miller, of San Francisco, Cal. (A. W. Boyken, of San Francisco, Cal., of counsel), for plaintiff.

Chas. E. Townsend and Wm. B. Bosley, both of San Francisco, Cal. (Garret W. McEnerney and Andrew F. Burke, both of San Francisco, Cal., of counsel), for defendant.

PARTRIDGE, District Judge. The patents in suit here are for an improvement in the art of manufacturing illuminating and heating gas from crude oil and steam. The earliest gas, of course, was made from coal. A bed of bituminous coal was placed in a retort, and heated from below; the resultant gas passing off above. The first use of water seems to have been to force steam over the incandescent bed of coals; the water being decomposed and the result being hydrogen, as $H_2$, and carbon monoxide. This was known as the "blue water gas," from the color of its flame, and was of little or no use for illuminating purposes, although of great calorific (235 B. T. U.).

The next step was the invention of Prof. T. S. C. Lowe, the father of the plaintiff in this suit. See Guarantee Trust & Safe Deposit Co. v. New Haven Gaslight Co. (C. C.) 39 Fed. 268. His apparatus consisted of two vertical chambers, connected by a throat at the top. The second chamber was nearly filled with refractory brick, arranged in checkerboard formation. The first chamber was filled with coal, and, by means of an air blast, this coal was heated to incandescence. The gases thus produced passed through the throat, and thence into the second chamber, heating the checker brick to incandescence and then passing through a stack. When this has been accomplished, the outlet to the stack is closed. Steam is then admitted into the first chamber, and in passing through the incandescent coal, the following reaction ensues: $C + 2H_2O = 2H_2 + CO_2$.

Then the inert $CO_2$ is broken up as follows: $C + CO_2 = 2CO$. Oil is sprayed into the second chamber, coming in contact with the blue water gas from the first chamber, and down through the checker brick. In addition to the free hydrogen and the carbon monoxide, the luminous quality is largely imparted by the formation of various carbohydrates, such as ethan ($C_2H_6$), ethylene ($C_2H_4$), acetylene ($C_2H_2$), benzine ($C_6H_6$), methane ($CH_4$), and their homologues. This method, however, was suitable only for the lighter oil; if the heavier were used, excessive heat was required, and the consequence was free carbon in such quantities as to clog the apparatus.

The next step, then, was the invention of the plaintiff. He devised a single chamber, containing checker brick. Oil, air, and steam were admitted at an intake at the bottom of the chamber, and fired. The heat and gases passed upward and were discharged at the top, until the brick were heated to incandescence. Then this lower intake and the outlet were closed, and steam and oil admitted at the top, passing down through the brick, and the resultant gases discharged at the bottom. Plaintiff then further modified this single chamber apparatus by a cylinder, having two series of checker brick, one above the other. Steam was admitted at the top of the upper series (thus acting as a superheater) and steam and oil at the top of the lower series of brick. From this the transition was easy to a two-chamber apparatus, both chambers being filled with the checker brick.

The plaintiff had patents covering these various improvements. On October 1, 1902, he granted to the predecessors of defendant licenses to use his machines in different territory. This method thus came into quite general use, and was quite generally successful. In large plants, however, there was a great objection to it, because it produced excessive quantities of lampblack. That resulted from the fact that the oil and the gases, having to pass the whole distance through the checker brick, were decomposed to the extent that the amount of free carbon was greater than could be taken up in

combination. Accordingly the plaintiff, in the latter part of 1903 or early in 1904, seems to have conceived the idea that he could obviate this difficulty by an intermediate outlet for the gas, so that it would be made in two directions. In December, 1904, one Jones, then in the employ of a predecessor of defendant, constructed two plants embodying this intermediate outlet, one at Sacramento and one at Fresno, both in California. Plaintiff applied for his patent on this improvement in August, 1905.

The plaintiff filed his bill in the usual form for infringement. The defendant answered, denying the allegations of the bill, except as to the issuance of the patents, and alleging:

(a) Lack of invention in view of the prior state of the art.

(b) Lack of utility and inherent inoperativeness.

(c) That Lowe was not the inventor of any substantial or material part of the thing patented.

(d) That if defendant's practices constitute infringement, then plaintiff's patents are invalid because defendant's predecessors, including the California Gas & Electric Corporation, were doing the identical things now charged to infringe, prior to plaintiff's alleged inventions, or either of them.

(e) That whatever Lowe sought to patent in his patents in suit was obtained surreptitiously from E. C. Jones, as gas engineer for the California Gas & Electric Corporation, who had been using reasonable diligence in adapting and perfecting the same. Section 4920, U. S. Rev. Stats. (Comp. St. § 9466).

(f) That defendant's predecessor had in successful commercial and public use at Fresno, Sacramento, and Woodland, as early as December, 1904 (some nine months earlier than Lowe's dates of application), and at Vallejo, San Jose, Redwood City, and Chico prior to said dates, apparatuses and processes involving the simultaneous making of gas in opposite directions and the use of a central outlet. Furthermore, defendant's predecessor had a number of additional like plants in course of erection and concerning which plaintiff must have had knowledge.

The case was referred to a master, against the protest of the plaintiff, "to take the testimony and report the same to the court with his findings and conclusions thereon; the same to be subject to the full consideration of the court." Evidence, amounting to nearly 4,000 pages, was taken, and the questions at issue were elaborately argued and briefed before the master. On the 15th of March, 1924, the master made his report, recommending decree for the defendant, upon the ground that plaintiff had not used reasonable diligence to perfect his invention, and that between the time of plaintiff's conception of the intermediate outlet and his application for a patent the defendant's predecessor (through Mr. Jones) had conceived the same thing and put it to practical use. The master, in view of this conclusion, deemed it unnecessary to consider the other defenses, such as lack of invention, no infringement, laches, and estoppel. Under the form of the reference, and the report, therefore, it has been necessary for the court to examine the whole matter as if it were submitted on depositions. Holt Manufacturing Co. v. Best Gas Traction Co. (D. C.) 245 Fed. 354. However, the main exceptions to the master's report, and the burden of the oral argument and the briefs on exceptions, concern the real ground of the master's decision as indicated above.

As bearing upon this, the basis of the master's decision, there is a great conflict in the evidence. Plaintiff testifies, and the master found, that he conceived the idea of an intermediate outlet, with the gas "made" in two directions, late in 1903 or early in 1904. He says that he had a drawing made of his design; this drawing was not produced, the explanation being that it was burned in the great fire of April 18, 1906. He also testified that he purchased in London and elsewhere certain instruments for experiment, such as a Junkers calorimeter, a Hemple gas analytical apparatus, a Le Chatelier pyrometer, and a Flicker photometer. The plaintiff claims that when these instruments were in his office Mr. Jones called to see them, and that plaintiff explained to Jones that they had been purchased for experimental purposes in connection with the idea of this new gas generator. It is claimed that at this time Lowe explained his idea to Jones and made a rough sketch of it, which Jones signed as a witness. This, however, is denied by Jones, and this sketch is also alleged to have been burned in the great fire.

It is claimed by plaintiff that he caused to be constructed a shell, or chamber, for experimental purposes in connection with his idea of the intermediate outlet, and sent it to Los Angeles, to be installed in the gas plant in Garvanza, a suburb of that city.

This shell, with other material, was at Garvanza in March, 1904. It was not, however, installed at that plant; the plaintiff giving as his reason that his father and brother were engaged in a controversy over the Garvanza works. In September, 1904, accordingly, this shell was removed to a plant in Los Angeles, known as the St. John street plant. Here plaintiff says he was confronted with certain ordinances, forbidding the erection of gas plants in that vicinity. The ordinance, however, was finally declared unconstitutional by the Supreme Court of the United States on November 14, 1904. Dobbins v. Los Angeles, 195 U. S. 233, 25 Sup. Ct. 18, 49 L. Ed. 169. After this plaintiff explains his failure to erect the generator by the fact that his erecting engineer had left, and that the only other available engineer (his brother, Sobieski C. Lowe) was otherwise engaged. At any rate, this experimental shell was never set up, and plaintiff applied for his patent on August 9, 1905. The master concluded that there was no showing of reasonable diligence in perfecting the idea, and that Jones was an independent inventor, whose conception was put into practical use before plaintiff's application for a patent, and upon that ground alone recommended decree for defendant.

The plaintiff first insists that under the patent laws the question of reasonable diligence in reducing a conception to practice is not in issue, if the period between conception and application for a patent is less than two years. This contention is based upon section 4886, Revised Statutes (Comp. St. § 9430), which reads as follows: "Any person who has invented or discovered any new and useful art, machine, manufacture, or composition of matter, or any new and useful improvements thereof, not known or used by others in this country, before his invention or discovery thereof, and not patented or described in any printed publication in this or any foreign country, before his invention or discovery thereof, or more than two years prior to his application, and not in public use or on sale in this country for more than two years prior to his application, unless the same is proved to have been abandoned, may, upon payment of the fees required by law, and other due proceeding had, obtain a patent therefor"— and on the fifth subdivision of section 4920, which provides for defenses, as follows: "That it had been in public use or on sale in this country for more than two years before his application for a patent, or had been abandoned to the public."

The plaintiff, however, in the first place, concedes that an abandonment may be shown by the conduct of the parties, even within the two-year period. Elizabeth v. Pavement Co., 97 U. S. 134, 24 L. Ed. 1000. The plaintiff, moreover, concedes that the evidence is conclusive that the defendant's predecessor, in at least two public service plants, put the idea of the intermediate outlet, and the consequent two streams of gas from opposite directions, to practical use between the time of plaintiff's conception and his application for a patent. He contends, however, that Jones received his idea of these plants from him. There is evidence in the record that, after plaintiff had received his scientific apparatus from London, he drew a rough sketch of his device and showed it to Jones, and that the latter signed it as a witness. The evidence upon this, however, is sharply conflicting, with serious charges of perjury on both sides. The master, however, found against this contention, and that in fact Jones had no knowledge of Lowe's idea, and was therefore an independent inventor, who put the idea to practical use before Lowe had either disclosed or reduced to practice.

[1] It is perhaps true that, in a case where reference is made without consent and against protest, this court is not bound by the findings of the master, and I have examined the evidence for myself. But necessarily, where the evidence cannot be reconciled, the master, who sees the witnesses, is in a better position to determine who is telling the truth than one who is confined to the written record. In this case, moreover, the master is one who has had long experience as a trier of facts. He was for several years one of the judges of the court of general nisi prius jurisdiction in this state, and his conclusions as to who was telling the truth are certainly entitled to great consideration.

[2] But, leaving aside the question of contradictions, and matters of that kind, the circumstances seem strongly to militate against the plaintiff's position. Mr. Lowe, the plaintiff, was the inventor of much that is necessary in making gas from oil. Upon the organization of the California Gas & Electric Corporation (a predecessor of defendant), in 1902, he granted to it a license to his rights under his then patent "and any and all other pending applications for letters patent or improvements thereon." In

return he received a large amount of the stock of the corporation. Then, in 1904, Jones built a "set" in Fresno, and another in Sacramento, embodying the intermediate outlet. Mr. Lowe claims that he knew nothing of these sets, however. But prior to this time Lowe and Jones had worked together for the construction of a large "set" (known to the record as No. 3) in Oakland, Cal., for the California Gas & Electric Company. This was after the alleged disclosure. But in the construction of this set neither Lowe nor Jones ever suggested the idea that the difficulty from the excessive production of carbon could be obviated by the use of the intermediate outlet. From these facts, it seems inevitably to follow:

(1) That Lowe had no more than a mere idea that the change might be valuable.

(2) That Jones could not have known that Lowe had "invented such a change."

Nor, indeed, is this situation left to the recollection of witnesses. The blueprints for this No. 3 set are in the record, marked "Lowe Crude Oil Water Gas Apparatus for California Gas & Electric Corporation. Embodying Suggestions of Mr. E. C. Jones." Moreover, in 1904, the California Gas & Electric Corporation undertook the erection of a large plant near San Francisco. A drawing for that plant is in the record, dated November 28, 1904. This plant was finished and put in operation early in 1906, and it embodied the use of the intermediate outlet for the gas. Plaintiff, however, apparently made no attempt to assert his rights until litigation between the defendant and San Francisco over rates for gas had been determined by the master. In the rate litigation, the question of the value of patents was involved. See Pacific Gas & Electric Co. v. San Francisco, 265 U. S. 403, 44 Sup. Ct. 537, 68 L. Ed. 1075. In 1920 the plaintiff wrote a letter to John A. Britton, the general manager of defendant, in which occurs this language:

"I can appreciate the fact that, were I now endeavoring to 'hold you up,' you might, through a feeling of resentment, if nothing else, refuse to deal, but by removing this feature I have reduced it to a very simple business proposition, the gist of which is: '(a) The inadvisability of embarrassing litigation at this time. (b) It is not a question as to whether you now have the right to the use of my patents, which speak for themselves, as does also your license covering former patents. (c)

You have much more to lose by litigation that you can possibly gain.'"

This letter failing to get results, this suit was filed in 1920. In view of all this, it seems incredible that the plaintiff could have disclosed his idea to Jones, and then have taken no steps, under the circumstances, for so many years, to enforce his rights. Nevertheless, I have examined the whole evidence. Some of the contradictions can be reconciled. Some can be explained by the weakness of human memory. Others, however, can be the result only of deliberate falsehood. To review this evidence in detail would serve no useful purpose. It is enough to say that, reviewing as a whole, I am convinced that the master was right, and I therefore hold that Jones was an independent inventor, and that he put his invention into practical use for the defendant, and the defendant in turn used it for the public, intervening the time of plaintiff's conception and this application for a patent.

The Supreme Court, in Woodbury Planing Mach. Co. v. Keith, 101 U. S. 485, 25 L. Ed. 939, points out that the patent law "is not unmindful of possibly intervening rights of the public." And in Automatic Weighing Machine Co. v. Pneumatic Scale Corporation, 166 Fed. 288, 92 C. C. A. 206, the Court of Appeals for the First Circuit said:

"We understand the true rule to be that a patentee who undertakes to carry back the date of his invention to his drawings and disclosure must show reasonable diligence in adapting and perfecting his invention, either by actual reduction to practice or by filing his application. This rule is supported by the great weight of authority, and we have found no cases which directly hold that this is not the law, although there are some cases in which a patentee has been permitted to carry back his invention to his drawings and disclosure, where the question of diligence was not raised or passed upon. Loom Co. v. Higgins, 105 U. S. 580, 594, 26 L. Ed. 1177; Dodge v. Porter (C. C.) 98 Fed. 624, 625; Westinghouse Electric & Mfg. Co. v. Stanley Instrument Co., 133 Fed. 167, 68 C. C. A. 523.

"No sound reason has been advanced why the doctrine of diligence should not apply to a patentee as well as to an inventor who has not secured a patent. On the other hand, any such distinction in favor of patentees is not in harmony with the patent

laws. We have seen that an invention in the sense of the patent law signifies a completed invention, and that the earliest date of an invention is the time of its completion. We have also seen that an invention may be completed either by actual reduction to practice or by filing a complete and allowable application in conformity with the statutes."

This language is quoted by the Court of Appeals for the Sixth Circuit in Twentieth Century Machinery Co. v. Loew Mfg. Co., 243 Fed. 373, 156 C. C. A. 153. In the latter case Judge Warrington said, at page 381 (156 C. C. A. 161):

"Defendant having shown with certainty anticipation of the patent in suit, as it appeared in the letters patent, it became necessary for plaintiff, as Mr. Justice Bradley said in Clark Thread Co. v. Willimantic Linen Co., 140 U. S. 481, 489, 492, 11 Sup. Ct. 846, 851, 35 L. Ed. 521, 'in rebuttal, to show, if not with equal certainty, yet to the satisfaction of the court,' that Volz invented his machine prior to the date of such anticipation. Michigan Cent. R. Co. v. Consolidated Car Heating Co., 67 Fed. 121, 129, 14 C. C. A. 232 (C. C. A. 6); Columbus Chain Co. v. Standard Chain Co., supra, 148 Fed. 622, 629, 78 C. C. A. 394 (C. C. A. 6); New England Motor Co. v. B. F. Sturtevant Co., 150 Fed. 131, 137, 80 C. C. A. 85 (C. C. A. 2); Charles Hunnicutt v. A. B. Gaston Co., 218 Fed. 176, 177, 134 C. C. A. 56 (C. C. A. 3); Consolidated Ry. etc., Co. v. Adams & Westlake Co., 161 Fed. 343, 350, 88 C. C. A. 355 (C. C. A. 7). It is to be observed, moreover, that the evidence must satisfactorily show, both that Volz possessed the earlier conception claimed, and that he thereafter exercised reasonable diligence in reducing his conception to practice. Christie v. Seybold, 55 Fed. 69, 76, 5 C. C. A. 33 (C. C. A. 6); Automatic Weighing Mach. Co. v. Pneumatic Scale Corp., 166 Fed. 288, 301, 92 C. C. A. 206 (C. C. A. 1)."

[4] Nor do I think that the two-year limitation of the statute excuses lack of "due diligence." The true rule, it seems to me, was enunciated by the present Chief Justice in Christie v. Seybold, 55 Fed. 69, 5 C. C. A. 33, as follows: "'The diligence of the first reducer to practice is * * * immaterial. It is not a race of diligence between the two inventors in the sense that the right

to the patent is to be determined by comparing the diligence of the two, because the first reducer to practice, no matter what his diligence or want of [diligence], is prior in right unless the first conceiver was using reasonable diligence at the time of the second conception and the first reduction to practice.' "

And I am heartily in accord with the finding of the master that plaintiff did not use due diligence in putting his idea into execution. Taking the testimony as most favorable to him, it amounts to: (1) A series of excuses for not using due diligence. (2) An unsuccessful attempt to put the idea into practice, abandoned by him. (The evidence shows that the "shell" shipped to Los Angeles was never used with the intermediate outlet.)

As was said in Clark Thread Co. v. Willamantic Linen Co., 140 U. S. 481, 11 Sup. Ct. 846, 35 L. Ed. 521: "It is evident that the invention was not completed until the construction of the machine. A conception of the mind is not an invention until represented in some physical form, and unsuccessful experiments or projects, abandoned by the inventor, are equally destitute of that character."

[5] Defendant insists that in any event there is no infringement. The testimony does raise serious doubt about it, and the master makes no finding. I do not consider it necessary to pass upon the question. I am constrained to the view, and I so find:

1. That the plaintiff was never an inventor of the making of gas in two directions, with an intermediate outlet, within the meaning of the patent law.

2. That he did not exercise due diligence in putting into practice his idea.

3. That whatever idea he had was abandoned until there had come in intervening rights of the public.

4. That he has been guilty of laches.

5. That, at least as to the defendant, he is estopped by his silence.

The report of the master is therefore approved, and the decree will be for the defendant. So far as general costs are concerned, I can see no reason for taking it out of the general rule, and they will follow the judgment. As to the master's fees, the reference having been in invitum the plaintiff, I will hear argument at any convenient time.