## CHRISTIE v. SEYBOLD.

### (Circuit Court of Appeals, Sixth Circuit. March 22, 1893.)

### No. 53.

1. PATENTS FOR INVENTIONS—INTERFERENCE—BILL IN EQUITY TO SECURE LETTERS PATENT—ESTOPPEL.

The failure of a party in an interference proceeding in the patent office to raise the question whether his opponent's invention includes the issue declared in the interference does not estop such party to raise that question in an equity suit, under Rev. St. § 4915, to determine his right to a patent.

2. SAME—BOOKBINDER'S PRESS.

Letters patent No. 450,882 were issued April 21, 1891, to W. H. Christie, for a bookbinder's press in which the platen could be quickly run up by hand without moving the power-driving mechanism. The patent was granted after a decision in Christie's favor upon an interference with an application by Charles Seybold. In the Seybold invention the pressure was obtained by a vertical screw, and transmitted to the platen by means of removable pipes of different lengths to suit the size of the bundle. In the Christie invention the power was obtained by a lever and pawl operating in connection with a ratchet wheel, pinion, and rack bar. In both inventions the platen was balanced by weights. The interference was declared on a claim for a "platen detachably connected with the power-driving mechanism and provided with a counterbalancing weight," which language was taken from the Christie claim. In the Christie invention, however, the point of disconnection was between the ratchet wheel and the lever pawl. Held, that this construction was fairly within the language of the claim and interference, notwithstanding that the point of disconnection was not immediately at the platen proper; and that there was an interference between the two inventions.

3. SAME—PRIORITY OF INVENTION—REDUCING TO PRACTICE.

The man who first reduces an invention to practice is prima facie the first inventor under Act July 4, 1836, (5 St. p. 117,) but the man who first conceives the invention may date it back to such conception if he uses due diligence in reducing it to practice, and he must use such diligence before, as well as after, the second conception of the invention. Reed v. Cutter, 1 Story, 590, followed.

4. SAME—DUE DILIGENCE—WHAT CONSTITUTES.

The person who first conceived a comparatively simple improvement in power presses for bookbinding made a rough sketch of it within a few months. Three years after his first conception he had working drawings made, and six months thereafter a machine was manufactured. He excused the delay by asserting that he could neither afford to buy the necessary tools sooner nor use them in his small shop. His reason for not having the machine made at another shop was that he would have made no profit on machines made by others according to his invention. Held, that he did not use due diligence so as to entitle him to a patent as against one who conceived the invention later, but reduced it to practice sooner, than himself.

5. SAME—SKETCH OF MACHINE.

A rough sketch of an invention is not such a reduction to practice as to make its author the original inventor, within the meaning of the patent laws.

6. SAME—CLAIM THAT THIRD PARTY WAS INVENTOR.

Under Rev. St. § 4915, the only question the court can consider is whether the complainant is the first inventor of a patentable device. Whether respondent or a third party was the inventor of the device for which respondent has received a patent should not be inquired into either by the court or by the commissioner in interference proceedings between the same parties.

Appeal from the Circuit Court of the United States for the District of Kentucky.

In Equity. Bill by Charles Seybold against William H. Christie to obtain the issue to complainant of letters patent which had been refused after a decision against him on an interference. A decree was entered for complainant. Respondent appeals. Reversed.

Statement by TAFT, Circuit Judge:

This was an appeal from a decree of the circuit court of the United States for the district of Kentucky, directing the commissioner of patents to issue a patent to Charles Seybold, the appellee and complainant below, for a device in a power press used in bookbinding, whereby the platen is "detachably con-nected with power-driving mechanism and provided with a balancing weight." The bill was filed below under section 4915 of the Revised Statutes, which provides as follows: "Whenever a patent, on application, is refused, either by the commissioner of patents, or by the supreme court of the District of Columbia upon appeal from the commissioner, the applicant may have remedy by bill in equity, and the court having cognizance thereof, on notice to adverse parties and other due proceedings had, may adjudge that such applicant is entitled, according to law, to receive a patent for his invention, as specified in his claim, or for any part thereof, as the facts in the case may appear; and such adjudication, if it be in favor of the right of applicant, shall authorize the commissioner to issue such patent, on the applicant filing in the patent office a copy of the adjudication and otherwise complying with the requirements of law. In all cases where there is no opposing party a copy of the bill shall be served on the commissioner, and all the expenses of the proceedings shall be paid by the applicant, whether the decision is in his favor or not."

The appellant, Christie, who was respondent below, secured a patent, one claim of which covered the device which Seybold averred that he first invented. Seybold filed his application June 6, 1889, and Christie, his, June 7, 1889. An interference was declared between them in the patent office, on the following claim: "In a power press a platen detachably connected with the power-driving mechanism and provided with a counterbalancing weight." The commissioner decided the interference proceeding in favor of Christie, and issued a patent to him, rejecting Seybold's application. Christie lives in Kentucky, and Seybold therefore began proceedings against him in that district.

The invention in controversy was an improvement in presses used by bookbinders for compressing the signature bundle into a solid form, about which is applied the cover to make the complete book. The platen is the upper plate of the press. As the signature bundles vary much in size, it is of advantage to move the platen up and down in the press quickly in order to give space for the insertion of the bundle under it. The mechanism used for producing a strong pressure, whether it be a screw or other means, has a slow movement. If the platen is rigidly connected with this power-pressure mechanism, it cannot be moved upward or downward to release the bundle or readjust the space for a different bundle with much greater rapidity than when pressure is being applied. The improvement was in so detaching the platen from the power-pressure mechanism as to allow it to move up and down independent of that mechanism, and, by means of counterbalancing weights, to render its movement very easy.

Seybold's device consisted of a top cast portion, A, and a base or bottom, B, which are connected by suitable stay rods, C, three on each side, which form a frame rack for the support of the top plate and screw rod. The top plate was provided with the central screw-thread hole, through which the screw, D, operated. The platen, H, was suspended between the stay rods, C, by means of suitable chains passing over suitable pulleys secured in brackets attached to the top plate and attached at the other end to the balancing weights, which were adapted to slide up and down on the outside of the stay

rods. The platen was guided by the stay rods in its movement up and down. Screw, D, was moved by a hand wheel and a lever, and the end of the screw, D, was connected with the platen by the connecting pipe, I, which served to communicate the pressure from the screw to the platen, and was merely an extension of the screw. A number of such connecting pipes, of different lengths, were provided to suit the size of the bundle. The pipe, I, was easily removable. By taking it out, the platen, H, might be moved up or down freely and easily by reason of the counterbalancing weights, and its height adjusted to leave the proper space between the platen and the base.

Christie's patent consisted of a press frame with a platen moving up and down between the sides of the frame as guides, and having rigidly attached to its upper side a rack bar, which, extending up through the top of the press frame, engaged above with a pinion or small cogwheel mounted upon a shaft journaled in two upright brackets fixed to the top of the press frame. To the same shaft were keyed ratchet wheels, which, by means of pawls and a lever, were rotated, driving the pinion, forcing downward the rack bar, and bringing the required pressure on the platen. On top of the rack bar was a cross bar, to the ends of which were attached cords passing up over pulleys journaled in upright posts supported on the top of the press frame, and carrying counterbalancing weights equal to the weight of the platen. The pawls which were engaged with a ratchet wheel to produce a rotary motion, forcing down the platen, might be thrown out of engagement with the ratchet wheel, and then the platen might be moved up or down easily by the aid of the counterbalancing weight. In doing so, of course, the pinion and ratchet wheels turned with the movement of the rack bar, but offered no obstruction to the upward or downward movement of the platen. The facts with reference to the invention by the two parties were as follows:

Seybold conceived of his invention in October, 1885, and made a rough sketch of it, which he showed to several persons in January, 1886. He was a machinist and inventor, and engaged in manufacturing numbering machines, perforators, cutting machines, index cutters, pasting machines, glueing machines, wood-staining machines, graining machines, polishing machines, sandpaper machines, and general repair work. At the time of his conception he says that he did not have the proper tools in his shop to make the machine. It would have required a planer, a long lathe, and a boring mill. He did not have the requisite tools until he moved into his new shop, on Webster street, in the month of March, 1889. From October, 1885, until October, 1888, he did nothing towards reducing his machine to practice. At the latter date he had full-sized drawings made, and his first machine was made in April, 1889. He applied for a patent June 6, 1889. The only reason which Seybold gave in the interference proceedings in the patent office for the delay in reducing his machine to practice was that he did not have the necessary tools or room in his shop. On the hearing below, another deposition was taken, in which he gave an additional reason. His evidence was as follows:

"Question. Please state why you did not have the proper tools, or why you did not secure them in the early part of 1886. Answer. Because my financial condition was such that I could not possibly buy those tools.

"Q. 4. Is there any other reason you can give? A. Yes, sir.

"Q. 5. Please give it. A. It would have been possible for me to order the press built by some other party; but as it has been my object to construct this press to be put on the market, and knowing the prices of presses built by my competitors, I found it impossible to build the press at the competition figure if ordered to be built in outside shops.

"Q. 6. The reason, then, that you did not have a press built shortly after you had invented the same, was because there would have been no profit in it for you? Is this correct or not? A. Yes, sir."

Christie claimed to have conceived of his invention in the summer of 1886. He had working drawings made and patterns ordered for the production of his press in the spring and early summer of 1888, and his press was completed about July 12th of that year. The machine was set up and put in operation in the Methodist Book Concern of Cincinnati about that date, and continued in operation until the bill herein was filed. A second machine was built in

October, and put in operation in that building. He filed an application for a patent June 7, 1889.

The court below held that Seybold was the first and true inventor of the machine, and entered a decree directing the commissioner of patents to issue a patent to him. The decree was based on the finding that while Seybold's device disclosed, "in a power press, a platen detachably connected with the power-driving mechanism," Christie's device did not.

Wood & Boyd, for appellant.

O. M. Hill, for appellee.

Before JACKSON and TAFT, Circuit Judges, and HAMMOND, District Judge.

TAFT, Circuit Judge, (after stating the facts.) The questions arising in this case, covered by the assignments in error, are two: First, does Christie's invention or device show, "in a power press, a platen detachably connected with the power-driving mechanism and provided with a counterbalancing weight?" and, second, if it does, which one of the two, Seybold or Christie, was the first or true inventor, within the meaning of the patent laws?

It is contended by appellant that it was too late for the complainant to raise the question, in the court below, whether Christie's device includes "a platen detachably connected with the power-driving mechanism," because it was not raised in the interference proceeding in the patent office. It is said he is thereby estopped to make it. We do not concur in this view. The interference issue is drawn up by the patent-office examiners, and the interference is declared, before either party has access to the specifications of the other, and the claims made with respect to the issue are submitted before the specifications are disclosed. Subsequently, perhaps, the question might be raised, but we do not think that a failure to raise it in the patent office prevents its being brought to the attention of the court in a proceeding like this by independent bill.

The fact, if it be a fact, that the invention of one of the parties does not include the issue declared in the interference, is apparent on the record. In one of the two cases considered by the supreme court under this section it was held that the court of its own motion must declare that the issuable device in the interference proceeding was not patentable for want of invention, and could therefore dismiss the bill, although the question had not been raised either in the patent office or by the parties in the court below or in the supreme court. Hill v. Wooster, 132 U. S. 693, 10 Sup. Ct. Rep. 228. We do not see why the court has not the same power with reference to the present question. The fact, if it be a fact, that Seybold did not raise it in the patent office, may, of course, affect the weight of his present objection, but it has no force as an estoppel.

Coming now to the question whether the Christie device embodies that which is described by the issue framed in the interference proceedings, we find that the issue was adopted by the patent office from the language of the first claim of Christie's patent,

and the question presented is really whether Christie's specifications entitle him to his first claim. In his specifications Christie says:

"My invention refers to an improvement in a press especially adapted for bookbinders. It relates more especially to a press platen which is made detachable from the power-driving mechanism and suspended by the counterpoise weight. The object of my invention is to provide ready means for raising and lowering a press platen by hand, without having to manipulate the power-driving mechanism, the various features of which will be set forth in the description of the accompanying drawings. * * * I preferably employ a rack bar and pinion driven by a ratchet lever to obtain power for compressing the platen, as it is rapidly and easily manipulated. The power is conveyed as follows: 13 represents the teeth of the rack bar, which engage with pinion, 14, mounted upon shaft, 15, which is journaled in ears of brackets, 16. * * * On the opposite side of the ratchet wheels 1 provide a duplex holding pawl, 31, which engages with the respective ratchet wheels. This pawl is nominally held in engagement with the ratchet teeth by means of the spring, 28, which presses them up, and they are held out of engagement by the wedge, 29, which is operated by the lever, 30. When lever, 30, is depressed, the wedge, 29, is raised up, and the spring, 28, presses the pawl, 31, into engagement with the teeth of the ratchet wheel. When said lever is raised up, it pulls the wedge, 29, down in between the holding pawl, 31, and the rear edge of the rack bar, 6, which prevents the engagement of the holding pawl, 31, with the teeth of the ratchet wheels. When lever, 18, stands in its normal position (shown in figures 2 and 4) the pawls are also in disengagement with the ratchet driving wheels. The press platen, 5, is therefore free to move up and down by extraneous means, so as to be adjusted to any desired height. * * * The above driving mechanism, with the shipping and unshipping connections, is the preferred form of construction, but I do not limit myself to said means, except where they are made special features of claims herein; but the importance of sustaining the platen by counterbalance weight, and having it readily detachable from the driving mechanism, so as to be raised independent thereof, is the special feature of invention. * * * The principal object to be accomplished by the above-described invention is the ready arrangement of the press platen by hand, without manipulating the same by the power lifting and depressing mechanism,—as, for instance, in a bookbinding or other similar use. the rapid operation of the press is a very important feature, and is accomplished by means to disengage the platen from the power-driving mechanism and suspending it by a counterpoise weight, allowing it to be readily raised or lowered, as the case may be; and the within-described mechanism I believe to be the best, and is claimed herein as of my invention."

Then follow the claims, the first of which is:

"In a power press, the platen, 5, detachably connected with the power-driving mechanism and counterbalanced by the weight, to hold the same in any adjusted position, substantially as specified."

The court below held that the power-driving mechanism consisted of the lever, the pawls, the ratchet wheels, the pinion, and the rack bar; and that as the ratchet wheel and pinion were fixed in their relation to the rack bar, and the rack bar was fixed to the platen, the power-driving mechanism was not detachably connected with the platen.

We think this construction too narrow. The expert for the complainant below testified that he had never heard the expression "detachably connected with," but that in this view it must mean that all the mechanism used to transmit the pressure to the platen should be capable of being detached from the platen. The patent

office took the expression from the specifications and claim of Christie, and it is only fair, therefore, in construing the meaning of the term, if ambiguous, to look into Christie's specifications to see what, in fact, is meant by the term "detachably connected with the power-driving mechanism." Of course Christie's specifications cannot be used for this purpose, if by so doing we are taken out of the Seybold invention, but if the issue framed by the patent office, by a fair construction, will include a feature present in both inventions, then it is the duty of the court to lean to that construction rather than to give it a strict and narrow one which will describe something present only in one. We are very clear that the two inventions have a common feature, viz. the easy elevation and lowering of the platen, secured by a counterbalancing weight and a device for the disengagement of the platen from the power-pressure mechanism and consequent independence thereof.

The amount of power required to compress the bundle makes necessary a somewhat cumbersome and slow action in the power-pressure mechanism. The object of both inventions is to temporarily free the platen from connection with the slowly-acting mechanism while the bundle is being put in the press. A device which unships the machinery conveying the great pressure power to the platen, so as to permit a free movement of the platen unrestrained by its connection with that machinery, makes the connection between the platen and the power-driving mechanism "detachable," within the meaning of Christie's specifications and the issue framed in this case by the patent office. It may be true that in a certain sense the pinion and the ratchet wheels and the rack bar are part of the power-driving mechanism when in action, though our impression is that, as the power is applied first on the lever, the machinery conveying the power to the platen beyond the lever is power-transmitting mechanism, and that the lever and pawl only may be properly called the "power-driving mechanism." But, whichever is the correct view, it is certain that, as soon as the pawls and lever which communicate the power to the ratchet wheels are unshipped, the ratchet wheels and the pinion are free to move without opposing any obstruction whatever to the easy up and down movement of the platen. When thus detached they are certainly no part of the power-driving mechanism. The result is exactly the same as if they were removed from their connection with the rack bar, because they make no resistance to the movement of the rack bar and platen. The specifications do not limit Christie to this one mode of applying the power, but the lever, pawl, and ratchet are described by him as the preferable mode. There are many well-known equivalents, and were at the time of this invention, of this power-driving mechanism, notably the screw described in Seybold's invention. For these reasons we are unable to agree with the learned judge below in respect to the ground upon which he placed his decision. We are therefore brought to consider the question which, in the view he took of the case, he did not find it necessary to pass upon,—

that is, who was the first and true inventor of that feature which we have found to be common to the two devices, and which is here the subject of controversy?

The patent statutes have always required such particularity of description in the applications for a patent as to leave no doubt that in the eye of the law he is the first and true inventor who first reduces the conception of a new invention or discovery to practical and operative form. In Bedford v. Hunt, 1 Mason, 302-304, Mr. Justice Story said:

"The first inventor who has put the invention into practice, and he only, is entitled to a patent."

And again, on page 305, he says:

"The intent of the statute was to guard against defeating patents by the setting up of a prior invention which had never been reduced to practice. If it were the mere speculation of a philosopher or a mechanician, which had never been tried by the test of experience, and never put into actual operation by him, the law would not deprive a subsequent inventor, who had employed his labors and his talents in putting it into practice, of the reward due to his ingenuity and enterprise."

So in Agawam Co. v. Jordan, 7 Wall. 583, Mr. Justice Clifford states the rule as follows:

"The settled rule of law is that whoever first perfects a machine is entitled to a patent, and is the real inventor, although others may have previously had the idea, and made some experiments towards putting it in practice. He is the inventor, and is entitled to the patent, who first brought the machine to perfection, and made it capable of useful operation."

So in Whitely v. Swayne, 7 Wall. 685, 687, Mr. Justice Nelson said:

"He is the first inventor and entitled to the patent who, being an original discoverer, has first perfected and adapted the invention to actual use."

This is the general rule, and had no exception under the statutes in force down to the act of July 4, 1836, (5 St. p. 117.) The fifteenth section of that act, in specifying the defenses which a defendant might set up in an action for infringement, permitted him to plead that the patentee "had surreptitiously and unjustly obtained the patent for that which was in fact invented or discovered by another who was using reasonable diligence in adapting and perfecting the same." The effect of the change made by the act of 1836 was considered by Mr. Justice Story in the case of Reed v. Cutter, 1 Story, 590, where, referring to the words "was using reasonable diligence in adapting and perfecting his invention," he said:

"These latter words were copied from the fifteenth section of the act of 1836, c. 357, and constitute a qualification of the preceding language of that section; so that an inventor who has first actually perfected his invention will not be deemed to have surreptitiously or unjustly obtained a patent for that which was in fact first invented by another, unless the latter was at that time using reasonable diligence in adapting and perfecting the same. And this I take to be clearly the law; for he is the first inventor in the sense of the act, and entitled to a patent for his invention, who has first adapted and perfected the same to use; and until the invention is so perfected and adapted for use it is not patentable. An imperfect and incomplete invention, existing in mere

theory or in intellectual notion, or in uncertain experiments, and not actually reduced to practice, and embodied in some distinct machinery, apparatus, manufacture, or composition of matter, is not, and indeed cannot be, patentable under our patent acts, since it is utterly impossible, under such circumstances, to comply with the fundamental requisites of those acts. In a race of diligence between two independent inventors, he who first reduces his invention to a fixed, positive, and practical form would seem to be entitled to a priority of right to a patent therefor. Woodcock v. Parker, 1 Gall. 438. The clause now under consideration seems to qualify that right by providing that in such case he who invents first shall have the prior right, if he is using reasonable diligence in adapting and perfecting the same, although the second inventor has, in fact, first perfected the same, and reduced the same to practice in a positive form. It thus gives full effect to the well-known maxim that he has the better right who is prior in point of time, namely, in making the discovery or invention."

Reed v. Cutter is a leading case, and has been followed by Mr. Justice Clifford in White v. Allen, 2 Cliff. 224, 2 Fish. Pat. Cas. 440, and in later cases.

It is obvious from the foregoing that the man who first reduces an invention to practice is prima facie the first and true inventor, but that the man who first conceives, and, in a mental sense, first invents, a machine, art, or composition of matter, may date his patentable invention back to the time of its conception, if he connects the conception with its reduction to practice by reasonable diligence on his part, so that they are substantially one continuous act. The burden is on the second reducer to practice to show the prior conception, and to establish the connection between that conception and his reduction to practice by proof of due diligence. It has sometimes been held, in the decisions in the patent office, that the necessity for diligence on the part of the first conceiver does not arise until the date of the second conception; but this, we think, cannot be supported on principle. The diligence of the first reducer to practice is necessarily immaterial. It is not a race of diligence between the two inventors in the sense that the right to the patent is to be determined by comparing the diligence of the two, because the first reducer to practice, no matter what his diligence or want of it, is prior in right unless the first conceiver was using reasonable diligence at the time of the second conception and the first reduction to practice. The language of the statute, (section 4920,) in the use of the imperfect tense, "was using reasonable diligence," shows the legislative intent to confer a prior right on a first conceiver in a case where, after his mental act of invention, and pending his diligent reduction to practice, another inventor enters the field and perfects the invention before his rival. The reasonable diligence of the first conceiver must be pending at the time of the second conception, and must therefore be prior to it. Reasonable diligence by the first conceiver, beginning when his rival enters the field, could only carry his invention back to the date of the second conception, and in the race from that time the second conceiver must win because of his first reduction to practice. See Rob. Pat. §§ 384-386; Millward v. Barnes, 11 O. G. 1060. The elaborate opinion of the commissioner of patents, Mr. Mitchell, in the interference proceeding be-

tween Christie and Seybold, reported in 54 O. G. 957, cites all the authorities, and is quite convincing on this point. We fully concur therein. As Christie reduced the invention to practice nearly a year before Seybold's press was made, the burden is on Seybold to show that from the time of his original conception, which antedated that of Christie, he was using reasonable diligence in adapting and perfecting his idea to practical use. Has he sustained that burden? It is quite clear to us that he has not. The question of reasonable diligence in any case depends, of course, upon all the circumstances. A complicated invention, requiring many experiments and much study to give it practical form, would reasonably delay a reduction to practice after the first conception for a greater length of time than where the idea and the machine embodying it were of a simple character. Bradford v. Corbin, 6 O. G. 223. Then, too, the sickness of the inventor, his poverty, and his engagement in other inventions of a similar kind are all circumstances which may affect the question of reasonable diligence. See Webster v. Carpet Co., 5 O. G. 522; Cox v. Griggs, 1 Biss. 362, 2 Fish. Pat. Cas. 174; Munger v. Connell, 1 O. G. 491; Proctor v. Ackroyd, 6 O. G. 603; Cushman v. Parham, 9 O. G. 1108.

In this case, Seybold's first conception was in October, 1885, and he did not reduce his machine to practical form until April, 1889, three years and a half later. He made a rough sketch in January, 1886. which he subsequently lost. In October, 1888, three years after his first conception, he had working drawings made, and six months later a press was manufactured. His excuse for his delay is that until the spring of 1889 he could not afford to buy the necessary tools for the manufacture of the press, and, if he had been able to do so, his shop was not large enough to permit the use of them. He does not say, however, that he had not the means to have the press made at some other shop, where the proper tools were to be had, but, on the contrary, intimates that he might have done so, but for the fact that there would have been no profit for him to sell machines made by others according to his invention. Now, we do not think this a good excuse for failing to make at least one machine, in accordance with his conception. It is as much as to say that in his view his new conception, when reduced to practice, would not have sufficient value and utility to bring him any return commensurate with the outlay required to reduce it to practice, and in consequence he indefinitely postponed putting it into practical form until circumstances should change. This is a temporary abandonment of the idea, (White v. Allen, 2 Cliff. 224,) and is not the due diligence which entitles him to the favor of the public, for whose benefit, primarily, the patent laws were enacted, (Wright v. Postel, 44 Fed. Rep. 352.)

It can hardly be claimed that the rough sketch made by Seybold of his proposed press in January, 1886, was a reduction to practice. It has been held in many cases that drawings, much more complete than the one here testified to, are not reductions to practice, as against a subsequent conceiver who first made an actual,

operative machine. Reeves v. Bridge Co., 5 Fish. Pat. Cas. 456; Lubricator Manuf'g Co. v. Renchard, 9 Fed. Rep. 293, (opinion by Mr. Justice Matthews;) Drill Co. v. Simpson, 29 Fed. Rep. 288; Ellithorpe v. Robertson, 4 Blatchf. 307; Draper v. Mills Corp., 13 O. G. 276; Odell v. Stout, 22 Fed. Rep. 159.

Further objection to reversing the decree is made on behalf of appellee on the ground that Christie was not the true inventor of the machine for which he obtained the patent. It is said that Christian Keck, who was in his employ, was the real inventor. We do not see how this is a subject which can be here investigated. The question here (section 4915, Rev. St.) is only whether Seybold was the first and true inventor. It is certain that some one reduced the invention to practice before Seybold did, and, if that is so, Seybold is not the first and true inventor, unless he was using reasonable diligence to adapt and perfect his conception; and we have found that he was not doing this. If Christie's patent is void because he was not the first and true inventor, and Keck was, that would not entitle Seybold to a patent. The commissioner of patents did not consider the question, and we think he acted rightly in this respect.

On the whole case we find, therefore, that Seybold is not the true and first inventor. The decree of the court below is reversed, with instructions to dismiss the bill at the costs of the complainant.