### MUTHER et al. v. UNITED SHOE MACHINERY CORPORATION.

(District Court, D. New Jersey. August 14, 1925.)

**1. Patents ⊗⟹114—Statute held to authorize action de novo to secure patent.**

Under Rev. St. § 4915 (Comp. St. § 9460), providing that, if application is refused by Commissioner of Patents, or by the Supreme Court of the District of Columbia on appeal from the Commissioner, applicant may have remedy by bill in equity, defeated applicant for patent may institute action de novo to secure patent notwithstanding Act Cong. Feb. 9, 1893, transferring powers of Supreme Court of District of Columbia to Court of Appeals.

**2. Patents ⊗⟹91(4)—Evidence held insufficient to establish that plaintiff had invented shoe eyelet setting device.**

In suit under Rev. St. § 4915 (Comp. St. § 9460), for patent, evidence *held* insufficient to establish that plaintiff had invented shoe eyelet setting device.

**3. Patents ⊗⟹114—Testimony, given long after experiment with device for which patent was claimed, and after litigation had been consummated in patent office tribunals, is entitled to little weight.**

In suit under Rev. St. § 4915 (Comp. St. § 9460), for patent, testimony given long after

experiment with device for which patent was claimed, and after litigation had been consummated in patent office tribunals, is entitled to little weight.

**4. Patents ⬥327—As between parties, decision as to prior invention is estoppel by evidence only so far as it goes.**

In suit under Rev. St. § 4915 (Comp. St. § 9460), for patent for shoe eyelet setting device, by two parties plaintiff, decision in suit for infringement by one of such parties against present defendant involving similar device, as to priority by patent, is estoppel by judgment only so far as it goes, and, since party plaintiff, not concerned in such prior suit, did not claim for recessed shoulder, decision has no force where claim was made on recessed shoulder.

In Equity. Suit by Lorenz Muther and another against the United Shoe Machinery Corporation to secure a patent. Bill dismissed.

Edward F. McClennen, Francis J. V. Dakin, and Dunbar, Nutter & McClennen, all of Boston, Mass., for plaintiffs.

Frederick P. Fish, Edward G. Curtis, Alex D. Salinger, Fish, Richardson & Neave, and Emery, Booth, Janney & Varney, all of Boston, Mass., for defendant.

BODINE, District Judge. This is an action brought under section 4915 of the Revised Statutes of the United States (Comp. St. § 9460), which is as follows:

"Whenever a patent on application is refused, either by the Commissioner of Patents or by the Supreme Court of the District of Columbia upon appeal from the Commissioner, the applicant may have remedy by bill in equity; and the court having cognizance thereof, on notice to adverse parties and other due proceedings had, may adjudge that such applicant is entitled, according to law, to receive a patent for his invention, as specified in his claim, or for any part thereof, as the facts in the case may appear. And such adjudication, if it be in favor of the right of the applicant, shall authorize the Commissioner to issue such patent on the applicant filing in the Patent Office a copy of the adjudication, and otherwise complying with the requirements of law. In all cases, where there is no opposing party, a copy of the bill shall be served on the Commissioner; and all the expenses of the proceeding shall be paid by the applicant, whether the final decision is in his favor or not."

By Act Feb. 9, 1893 (chapter 74, 27 Stat. 434), powers of the Supreme Court of the District of Columbia were transferred to the Court of Appeals. McKnight v. Metal Volatilization Co. (C. C.) 128 F. 51.

[1] The statute quoted makes it possible for a defeated applicant for a patent to institute an action de novo for the purpose of securing a patent.

Mr. Justice Brewer said, in Morgan v. Daniels, 153 U. S. 120, 125, 14 S. Ct. 772, 773, 38 L. Ed. 657 (the italics throughout are mine):

"Upon principle and authority, therefore, it must be laid down as a rule that, where the question decided in the Patent Office is one between contesting parties as to priority of invention, *the decision there made must be accepted as controlling upon that question of fact in any subsequent suit between the same parties, unless the contrary is established by testimony which in character and amount carries thorough conviction.* Tested by that rule, the solution of this controversy is not difficult. Indeed, the variety of opinion expressed by the different officers who have examined this testimony is persuasive that the question of priority is doubtful, and, if doubtful, the decision of the Patent Office must control."

The Circuit Court of Appeals, in Rousso v. Barber, 3 F.(2d) 740, 741, said:

"Though the Court of Appeals of the District of Columbia becomes, in a patent prosecution, an appellate tribunal of the Patent Office, its decisions are not final. Federal courts, in suits formally brought, have full jurisdiction to re-examine all matters there determined and come to opposite decisions. Quaker City Chocolate Co. v. Loughran (C. C. A.) 296 F. 822. Yet it is equally well established that 'when a question between contending parties, as to priority of invention, is decided (by the Court of Appeals of the District of Columbia) the decision there must be accepted as controlling, * * * in any subsequent suit between the same parties, unless the contrary is established by testimony which, in character and amount, carries thorough conviction' "—citing Morgan v. Daniels, 153 U. S. 120, 14 S. Ct. 772, 38 L. Ed. 657; Gold v. Newton, 254 F. 824, 150 C. C. A. 270, certiorari denied 249 U. S. 608, 39 S. Ct. 290, 63 L. Ed. 799.

On August 10, 1914, the complainant applied for a patent upon an eyelet setting device. In the bill of complaint, twelve claims are set forth as included in the application for the patent and the amendments thereafter made.

In the manufacture of shoes where the eyelet for lacing is inserted, there is ordi-

narily the outer leather, a stay, a lining, and the inner facing. The invention is a punch used in an ordinary machine to set invisible eyelets. The operating feature is the shoulder so constructed that it will pass the outer leather of the shoe and encounter the eyelet reversely presented below the outer leather. The device sets the blind eyelet. The advantage is that the shoe may be blind-eyeletted after having been stitched.

[2] Some time in 1912, Deitsch, the alleged inventor, testifies:

"The forelady, Miss Rabenhorst, brought a shoe to my attention that needed a blind eyelet, and asked me if I could think up some way of doing that operation at one time, or a method of setting that eyelet in one operation, I ought to have said. * * * It naturally led to a trend of thoughts that resulted in me taking one of the regular punches used in visible eyelets, on the Peerless Rapid machine, and I annealed it, turned back the shoulder, cutting away part of the shank, reduced the point somewhat, again tempered it, put it in the machine, the Peerless machine, and I produced blind-eyeletting."

Miss Rabenhorst, forelady of the Blue Ribbon plant of the Brown Shoe Company, corroborated Deitsch, as also did Mary Preut of the fitting room of the same plant.

The several punches made by Deitsch at this time have been lost; also the drawings he made.

Documentary evidence as to the device consists in a letter of August 19, 1912, written by Edmund Muther, of St. Louis, to the Peerless Machinery Company of Boston, a corporation composed of Lorenz Muther, Sr., and his sons. The letter is as follows:

"We inclose a punch to set blind eyelets same way as regular eyelets are set; that is, it is not necessary to separate the lining of a quarter from the quarter itself to set the blind eyelet. We inclose some of the work done under power, witnessed by the writer, with the No. 22 brass eyelet. There should be two long springs on the punch block extending over the set hole to hold the stock against the punch so that the quarter will spread over the secondary shoulder of the punch. The punch we inclose is crude. *The machinist at Blue Ribbon made it the best he could with what he had to work with. He would like to have you make up a few for him more after the sketch we inclose. With a little perfecting, we believe this could be made to work good."*

To this letter, the Boston office sent the following reply:

"We have your favor of the 12th, together with sample of the work done with the blind eyelet hook punch, and we are going ahead and making punches. It is pretty difficult from your description and your sketch to get the idea of the springs. We have made it out to be two flat springs, or it could be done with one flat spring, made similar to the inclosed sketch, and fastened in some manner on the work plate, and not on the punch block. This spring could be a flat spring. Kindly advise if we are correct. *Of course, we can go ahead and experiment on this thing, but it will save time, no doubt, if this information comes to us, as it has already been worked out entirely in St. Louis."*

Other witnesses for the plaintiffs testified to Deitsch's invention. It must, however, be remembered that the facts the witnesses relate occurred nearly 13 years ago, and that the witnesses were Deitsch, the Muthers (the assignees of Deitsch), and employees of the Brown Shoe Company. Obviously, the more intelligent of the group had an interest in the outcome of the litigation, and the less intelligent had not that degree of mental development which would enable them to appreciate the qualities of the exact device and the success or lack of success in its operation. The interdepartment communications referred to seem to indicate that Deitsch's blind eyelet device had gone no further than a thought, which the St. Louis office hoped might be perfected into a useful device. Certainly the Boston office thought that the information sent forward was no more than a suggestion upon which they might experiment.

Miss Rabenhorst testified that the Deitsch device, or what she understood as the Deitsch device, was put into operation, and that it worked, as she says, O. K. She, however, said that it did not work very well on certain of the types of shoes manufactured by them. Mary Preut thought the difficulty was with the machine on which the punches were used, and not with the punches.

The case is utterly lacking in testimony indicative that orders were executed at the Blue Ribbon plant for shoes upon which the blind-eyeletting device was used.

This court is asked to find, notwithstanding the Patent Office decisions in six interference cases, that Deitsch was the pioneer inventor. The testimony in character and amount carries thorough conviction that Deitsch was not the inventor of this extremely precise instrument capable of setting blind eyelets.

The evidence shows that a difference of

.003 of an inch would spell the difference between success and failure in operation. Two punches made so closely alike that to the naked eye they are precisely similar, yet one may be a success while the other will fail. The difference in the leather to be punched must be compensated for in differences in the punch that is to be used.

In January, 1914, Lorenz Muther, Sr., a highly intelligent man and founder of a great business, who had developed an eyelet setting punch and set combined, took up with his attorney the question of the advisability of applying for a device and method patent. Drawings were prepared, and the application was put under way. Some of the punches and sets prepared by Muther had the recess above the setting shoulder. The Court of Appeals of the District of Columbia in the appeal in the interference suits said:

"Each of the tribunals of the Patent Office found that, while Deitsch conceived the invention in August of 1912, he did substantially nothing toward its reduction to practice prior to his filing date, about two years later, and hence that, as stated by the assistant commissioner, he 'was utterly lacking in diligence.' Each of the tribunals has satisfactorily discussed the evidence bearing upon this question, and we are content to adopt their conclusion without further consideration of that evidence. * * * Inasmuch as Doulett, as early as September of 1913, had successfully reduced to practice and thereafter continued to operate in the manner already detailed a machine embodying the subject-matter of this interference, we agree with the Examiner of Interferences that the award of priority should go to Doulett. In No. 1425, wherein the counts are limited as in No. 1424, since March 19, 1914, is the earliest date claimed by Glines for conception, it follows that priority also should be given Doulett, as found by the Examiner of Interferences. In each of the other interferences we accept the reasoning and conclusions of the Patent Office."

It is the plaintiffs' contention that, if Deitsch did not reduce his invention to practice, Muther did reduce it to practice in the late part of 1913 or the early part of 1914, and that his reduction to practice inures to the benefit of Deitsch. All these questions were before the Patent Office and were disposed of by them.

For the sake of clarity, the pertinent portions of the decisions in interferences are as follows:

In the decision in interference No. 38362, Doulett v. Deitsch v. Cote, the Examiner of Interferences said:

"Deitsch has not established any reduction to practice prior to his filing on August 10, 1914, and is found to have been lacking in diligence during the period of Doulett's entry into the field and reduction to practice."

In his decision in interference No. 38364, Deitsch v. Doulett v. Cote, the Examiner of Interferences, after fully reviewing the Deitsch evidence, which is substantially identical with that in the present case, said:

"It is therefore held that the evidence submitted on behalf of Deitsch as to his work in 1912 is insufficient to establish a successful reduction to practice of the invention. No evidence is of record showing a use by Deitsch of his punch subsequent to 1912 and prior to the filing of his application or of any activity in connection therewith which could be taken as indicating that he believed that he had achieved a satisfactory reduction to practice."

The Examiner of Interferences continues:

"Moreover, no benefit accrues to Deitsch from the work of Muther as the latter cannot be considered as acting as Deitsch's agent. Howell, Jr., v. Hess, 132 O. G. 1074, 30 App. D. C. 194."

In the decision of the Examiners in Chief in interference No. 38364, they said, after reviewing the testimony:

"The evidence, in our opinion, will not support a finding that the practicability of the invention was demonstrated by Deitsch prior to August 12, 1912. Following August 12, 1912, Deitsch did nothing with the invention until the spring of 1914, when he sold his interest therein to Lorenz Muther and executed an application for patent upon the same which Muther had caused to be prepared * * * Deitsch made no actual reduction to practice."

Continuing, the Examiners in Chief say as to Muther's activities:

"Muther appears to have reduced to practice the invention in issue, in a punch which includes as an essential inventive feature a recess which Deitsch's punch did not have. This was in January, 1914, prior to the purchase of Deitsch's invention by Muther. This reduction to practice by Muther can be given no effect in this case where the question is whether Deitsch or Doulett was the prior inventor. Robinson v. McCormick, C. D. 1907, p. 574, 29 App. D. C. 98, 10 Ann. Cas. 548; Howell v. Hess, 132 O. G. 1074, 30 App. D. C. 194."

In their decision in interference No. 38362, the Examiners in Chief, referring to their decision in interference No. 38364, said:

"In that interference we found Doulett entitled to the earlier date of reduction to practice by reason of his August 1, 1914, application, and because we found Deitsch entitled to no date of reduction to practice prior to the filing of Deitsch's application on August 10, 1914. * * * Deitsch is entitled to no date of reduction to practice prior to August 10, 1914. * * * Nor can Deitsch, in our opinion, derive any benefit in this regard from Muther's reduction to practice or from the issue of Muther's patent on October 6, 1914."

The Commissioner of Patents, after thoroughly reviewing the testimony again, said, in interference No. 38364:

"It must be held, therefore, that Deitsch has established no reduction to practice and that what he did in 1912 amounted merely to an abandoned experiment."

Continuing, the Commissioner says:

"Obviously the making of a punch by Muther in the early part of 1914 was not a reduction to practice of Deitsch's invention, since Muther was in no sense the agent of Deitsch (Howell, Jr., v. Hess, 132 O. G. 1074, 30 App. D. C. 194), nor does the fact that Muther subsequently bought Deitsch's invention and filed an application therefor give him the right to claim that his work was a reduction to practice of Deitsch's invention of which, Deitsch or he, as Deitsch's assignee, can claim the benefit."

This court has no difficulty in finding that the evidence clearly shows that whatever Deitsch had in mind was no more than a thought in which he had no particular confidence himself. After he showed his somewhat shortened punch and set to the St. Louis office of the Muthers, he took no steps whatever about the matter until on August 10, 1914, a patent application was filed in his name. The case is utterly barren of evidence that Muther was the agent of Deitsch. During the period between the summer of 1912 and the summer of 1914, other independent inventors applied for patents upon invisible eyelet devices.

The law, as found by the Court of Appeals of the District of Columbia, is well established. Mr. Chief Justice Taft, while Circuit Court Judge in the Sixth Circuit, said, in Christie v. Seybold, 55 F. 69, 76, 5 C. C. A. 33, 40:

"It is obvious * * * that the man who first reduces an invention to practice is prima facie the first and true inventor, but that the man who first conceives, and, in a mental sense, first invents a machine, art, or composition of matter, may date his patentable invention back to the time of its conception, if he connects the conception with its reduction to practice *by reasonable diligence on his part,* so that they are substantially one continuous act. *The burden is on the second reducer* to practice to show the prior conception, and *to establish the connection* between that conception and his reduction to practice by *proof of due diligence.* It has sometimes been held, in the decisions in the Patent Office, that the necessity for diligence on the part of the first conceiver does not arise until the date of the second conception; but this, we think, cannot be supported on principle. The diligence of the first reducer to practice is necessarily immaterial. It is not a race of diligence between the two inventors in the sense that the right to the patent is to be determined by comparing the diligence of the two, because the first reducer to practice, no matter what his diligence or want of it, is prior in right unless the first conceiver was using reasonable diligence at the time of the second conception and the first reduction to practice."

[3] Obviously, Deitsch, although he first conceived, is entitled to nothing unless by reasonable diligence he reduced to practice. This he never did. Deitsch at first did not claim to have done more than experiment with a few scraps of leather and upon a trial shoe. The trial shoe is nothing more than an upper made before the sample shoes are made to display to the trade. Testimony given long after the event and after litigation had been consummated in the Patent Office tribunals is entitled to little weight. Even the witnesses for the plaintiff say that the device did not work in a satisfactory way. There is real doubt as to what, if anything, he did conceive.

Lorenz Muther, Sr., when he applied for his patent, knew nothing, except that a man named Deitsch was said to have some sort of a device for setting blind eyelets. He had not seen Deitsch's device. He worked out his own device independently.

The case is utterly devoid of evidence that Lorenz Muther, Sr., ever consulted with Deitsch about the matter or ever knew of the Deitsch device until he (Muther) was preparing his patent application. This is not a case where the man with the concept reveals that to another, who reduces it to practice, but is a case where the individ-

ual with the concept, if he had it, had no faith in it, and did nothing with it.

Lorenz Muther, Sr., visited the Peters Shoe Factory in St. Louis in 1913, to see how they did invisible eyeletting. He found two machines set up—one arranged to do the punching, and the other arranged to spread the eyelets in the lining portions of the shoes. A year after the alleged invention, the Deitsch device for punching and setting was not used. It was not until 1914, after Muther had started to make his application for his independent invention, that any mention was made at all to the patent lawyer about the Deitsch device; then the patent lawyer advised the purchase of whatever Deitsch might have. After some bargaining, Deitsch's rights were acquired for $250. The Muthers' patent lawyer then prepared the application, in April, 1914, for the device without the recess above the setting shoulder.

Even after Lorenz Muther, Sr., had acquired Deitsch's right, he still incorporated in his patent application claims broad enough to cover the alleged Deitsch device. The Deitsch application was completed on May 13, 1914, but the patent lawyer made no attempt to file it until August 10, 1914. The reason for the late filing of the Deitsch application was that the patent lawyer had received notice of the interference on Muther's broad claim for a setting device.

The alleged Deitsch device was made by cutting down on a lathe the ordinary eyelet setting tool. Even the drawings made up, after the dispute arose, from recollection, said to be like the alleged lost drawings, do not show the recessed or contracted portion above the setting shoulder.

[4] In the case of United Shoe Machinery Corporation v. Muther (C. C. A.) 288 F. 283, the bill for the infringement of the Muther patent involved the contracted portion above the setting shoulder. The court said (page 292):

"We have, however, carefully examined the whole record, and, after giving due weight to the decisions of the Patent Office and the Court of Appeals, we think the evidence is clear and convincing that Doulett had not invented any invisible eyeletting tool with a contracted portion above the upsetting shoulder before the plaintiff's application was filed in the Patent Office"

As between the parties, the decision is an estoppel by judgment only so far it goes. Since Deitsch did not claim for the recessed shoulder, the decision has no force here.

The evidence shows that the Doulett device was in use in the Leonard & Barrows' factory before December 15, 1913, and that it was satisfactorily operating; that at that date his sets were provided with the sliding sleeve, spring, set screw, etc., as shown in his application for patent, to all of which Deitsch made no claim. Further, before he used a set having such appurtenances, he made and used simpler ones, which were merely solid sets without sleeves, springs, etc., and like the Deitsch device except that they were solid and not hollow.

There is no evidence which would justify this court in finding other than as the Patent Office tribunals and Court of Appeals have found. The case clearly shows that, during the period after Deitsch first had his notion that the work could be done, Doulett, Smith, and others independently conceived the invention and reduced to practice.

The bill will be dismissed, with costs.