**HESTON et al. v. KUHLKE et al.**

No. 10935.

United States Court of Appeals
Sixth Circuit.

Jan. 16, 1950.

O. C. Limbach, and John F. Oberlin, Cleveland, Ohio; John C. Frank, Akron, Ohio, L. M. Buckingham, Akron, Ohio, on brief, for appellants.

Albert L. Ely, Akron, Ohio; Ely & Frye, Akron, Ohio, Albert L. Ely, Jr., Cleveland, Ohio, Wise, Roetzel, Maxon, Kelly & Andress, Cletus G. Roetzel, Akron, Ohio, on brief, for appellees.

Before HICKS, Chief Judge and SIMONS and MARTIN, Circuit Judges.

SIMONS, Circuit Judge.

The cause is one begun by Heston seeking a patent under § 4915, R.S., Title 35 U.S.C.A. § 63, as an unsuccessful party to interference proceedings in the Patent Office, numbered 78936, 78937, 77479 and 78938. National Rubber Machinery Company is assignee of Heston and both urge Heston's priority of conception and constructive reduction to practice of inventions covered by claims granted in the Patent Office to the appellees Kuhlke and Soderquist. The latter, successful in proceedings before the Board of Interference Examiners, were awarded priority, Kuhlke in Nos. 78936 and 78937, and Soderquist in Nos. 77479 and 78938. Kuhlke's application matured into patent No. 2,340,191 and Soderquist's into patent No. 2,340,231, both issued January 25, 1944. Both applications had been assigned to the McNeil Machine and Engineering Company and so the patents issued to it.

In the complaint Heston claims to be the original, first and sole inventor of the improvements claimed by and granted to both Kuhlke and Soderquist, asserts they de-

rived the inventions from him and his assignee and that the claims of both patents are invalid by reason of prior knowledge and use by others and prior publication. He seeks a decree that he was the original inventor of the subject matter of each of the counts in the interference, that the Commissioner of Patents be directed to issue patents to his assignee covering such counts and an adjudication that neither Kuhlke nor Soderquist is the original and first inventor of the subject matter of any of the counts of the interference, and that the National Rubber and Machinery Company be declared entitled to an assignment of the Kuhlke application. At the trial there was submitted the full record of the evidence and exhibits before the Board of Interference Examiners with some additional oral testimony and exhibits. The court found the evidence insufficient to establish the plaintiffs as entitled to patents, doubted its authority under § 4915 to examine the validity of the patents granted to the appellees on the ground that it did not appear from the testimony that novelty or originality was wanting in the claims, and dismissed the bill. This appeal followed.

The counts in interference and the claims granted to Kuhlke and Soderquist relate to means for the purpose of "shear stripping" a vulcanized tire from the mold in which it has been formed, in a conventional vulcanizing press of the so-called "watch-case" type. The object of the interfering parties was to provide improved means for removing the vulcanized tire from the mold sections or cavity members by using the mold sections themselves through the provision of means for raising and transversely shifting one member relatively to the other. In both Kuhlke and Soderquist one of the mold sections is thus operated to strip a tire. It is contended, however, that the awarded claims were drawn broadly enough to include similar use of a supplemental ring introduced into the press after the lifting of the upper mold section and brought into gripping relation on the tire for the purpose of freeing it from the mold. Such supplemental mold cavity is referred to in the evidence and briefs as a suction or "sucker" ring by reason of the fact that its gripping relation to the tire was to be brought about by vacuum contact with it. This concept was claimed by Heston who urges that it responds to the language of the granted claims within the reference therein to "means for simultaneously raising and transversely shifting said cavity member a substantial distance transversely of its axis while embracing the tire to loosen said tire from said mold cavity members."

The history of the several applications is somewhat unusual. The earlier method of removing a cured tire from the mold was to clamp the beads of the tire between two "bead rings" which were elevated after the press opened to lift the tire from the lower mold section. The first shear-stripping press, responding to the claims in interference, was one built by McNeil and sent to the Goodyear plant in Akron on June 23, 1938, and given an experimental run under actual working conditions. It involved the elements and teachings of the Kuhlke and Soderquist patents in that the upper mold section is first raised slightly to clear the mold register. The mold section is then shifted backwardly while the tire is still in its path. Such action causes the non-skid formations in the upper mold section to seize the upper portion of the tire on one side of its axis while the lower portion of the tire is engaged by the lower section of the mold on the other side of the tire axis. A continued upward and backward movement of the upper mold section will peel the tire out of both mold sections while it is compressed between them, and after the tire is freed from the mold, the upper mold moves to a point where the tire drops out of the mold. It is contended by the appellee that this experimental run created one of the greatest sensations that the art had known for years, that it was brand new to the trade and that Goodyear promptly decided to adopt this style of press for all its new requirements and that other companies quickly followed suit until McNeil shear-stripping presses completely superseded the old style presses.

National and others learned of this development and proceeded to rush applica-

tions for patents into the Patent Office. Heston filed his application on December 15, 1938, but was junior to the Soderquist application filed on April 1, 1938 and the Kuhlke application filed on September 21, 1938.

The McNeil press was designed by Soderquist and before it left the plant photographs were taken of it in its several positions, a set of which came into the possession of Harris of the S. W. Harris, Inc., who, in the middle of July, exhibited them to Kuhlke. Kuhlke immediately became deeply concerned, got in touch with members of the McNeil organization and their patent attorney, disclosed to them that Kuhlke had had a conception of the principle of the McNeil press which had been conveyed to Soderquist and the man who built the McNeil press prior to its operation or the filing of the Soderquist application. He had conceived the idea of shear-stripping in January, 1936, and had hired an Engineer Williams to embody his ideas in detailed drawings which were completed on March 7, 1936. These later became the basis for the drawings of his patent. Williams had been associated with Harris, Safreed, the President of the McNeil Company and Michelson, its sales manager. In July, 1936, Williams, without crediting Kuhlke, had discolsed to Michelson the Kuhlke idea of a self-stripping tire press which immediately struck Michelson as something new and different in tire press construction.

At meetings with the McNeil representatives Kuhlke produced the original drawing prepared by Williams. McNeil became convinced of Kuhlke's priority of conception, of Soderquist's derivation from Kuhlke and that the experimental press sold to Goodyear was a reduction to practice of Kuhlke's idea. The result of these meetings was that McNeil acquired Kuhlke's rights, Kuhlke applied for his patent, assigned his application to McNeil who, as the owner of the Soderquist application, arranged to have the broad claims originally made therein transferred to Kuhlke, and by agreement, bound itself to pay substantial royalties to Kuhlke. This evidence of Kuhlke's priority of conception and its re-

duction to practice in the McNeil vulcanizer so impressed the Board of Interference Examiners that it granted priority to Kuhlke notwithstanding vigorous challenge that the whole story was concocted for the purpose of circumventing the claim that the invention was derived from Heston. It impressed the court below that it had the ring of truth. It so impresses us. While the Board of Interference Examiners failed to find that Kuhlke had a fixed conception of a particular operative mechanism on January 5, 1936, it did hold, upon satisfactory evidence, that Kuhlke had a complete conception of the invention in issue on March 7, 1936.

While Heston claimed conception of his invention in the latter part of 1936, his earliest record date is that of January 21, 1937, based upon sketches reproduced as Figure 8 in an application filed on April 20, 1937 by one Iverson, at the time a fellow employee of Heston at National. This application had been assigned to National and subsequently issued into patent No. 2,169,146, dated August 8, 1939. It was Heston's contention that he had communicated his idea to Iverson and so was entitled to Iverson's application date as a constructive reduction to practice.

The burden cast upon Heston in order to sustain his claim to priority over Kuhlke is two-fold. He must not only overcome the evidence which carried Kuhlke's date of conception and reduction to practice back to 1936, but must establish his own date of conception and practice as of January 21, 1937. If he fails in either, his claim to priority must fall. The occasion for Heston's conception, according to his story, was that he developed the idea while his employer, National, was building a new tire vulcanizing press for the Ford Motor Company in the latter part of 1936. Although one of the Ford objectives was to handle the tires automatically in and out of the vulcanizer, it seems strange that he made no effort to incorporate his idea into the presses being made for Ford. His only explanation for failing to develop his idea during the designing of the Ford presses, was that Ford had lost interest in the subject of automatic handling. His

contention that he had communicated his concept to Soderquist both by word of mouth and by sketches substantially in the form shown in his application, is denied by Soderquist and was credited neither by the Examiner, the Board nor the court. He contends also that his concept was disclosed to Iverson and to National's patent attorneys who were preparing the Iverson application.

Heston must stand or fall with respect to the 1937 date upon Figure 8 of the Iverson application and patent. Of this the Board said that it constitutes probably the clearest disclosure of Heston's conception. However, it merely shows links or levers attached to the suction ring, with no means shown for actuating such links or levers to produce the movement specified in the interference counts, and the description fails to provide a verbal picture of any particular mechanism for imparting the required motion to the suction ring. The Board therefore concluded that while Heston may have had the germ of an idea there is no corroborated evidence that he had developed it to the point where it might be considered a conception of the patent invention in issue. The court below agreed. Even were we to consider that Heston's concept of handling the vulcanized tire out of the molds by grasping them with a ring in vacuum contact with the tire was the equivalent of the method disclosed by the interference claims, it seems clear to us that Figure 8 does not disclose a complete and operable mechanism.

 While an action under § 4915 is an independent proceeding, the Supreme Court made it clear in Morgan v. Daniels, 153 U.S. 120, 14 S.Ct. 772, 773, 38 L.Ed. 657, that it is something more than a mere appeal,—"It is an application to the court to set aside the action of one of the executive departments of the government. * * * It is something in the nature of a suit to set aside a judgment, and, as such, is not to be sustained by a mere preponderance of evidence. Butler v. Shaw, C. C., 21 F. 321, 327. It is a controversy between two individuals over a question of fact which has once been settled by a special tribunal, entrusted with full power in the premises." And again, "where the question decided in the patent office is one between contesting parties as to priority of invention, the decision there made must be accepted as controlling upon that question of fact in any subsequent suit between the same parties, unless the contrary is established by testimony which in character and amount carries thorough conviction." We have examined with care the record made before the Board of Interferences and the additional testimony and exhibits submitted to the district court. We are unable to conclude that Heston's case either eliminated the date of Kuhlke's prior conception or that it established Heston's asserted date of conception and reduction to practice.

 We come, then, to the proposition vigorously urged upon us both in argument and brief, that the court should either primarily or at any rate secondarily, have considered the appellant's challenge to the validity of the Kuhlke and Soderquist patents. There is little doubt that the primary purpose of § 4915 is to give an unsuccessful interferant an opportunity to establish priority of invention as an alternative to the review provided by law from the Board of Interference Examiners to the United States Court of Custom and Patent Appeals. The doctrine that in an action under § 4915 the courts may, and in certain circumstances should consider validity, stems from Hill v. Wooster, 132 U.S. 693, 10 S.Ct. 228, 230, 33 L.Ed. 502, but this doctrine is clearly not one of universal application. There the Supreme Court said, "It necessarily follows that no adjudication can be made *in favor of the applicant,* unless the alleged invention for which a patent is sought is a patentable invention." It will be observed that as originally pronounced, the doctrine proclaims the necessity of considering validity in only those cases where an adjudication can be made in favor of the applicant. That this is not merely naked judicial fiat but is based upon logic and public interest, appears from what follows, "A determination of that issue alone, in favor of the applicant, carrying with it, as it does, authority to the commissioner to issue a patent to him

for the claims in interference, would necessarily give the sanction of the court to the patentability of the invention involved." This is not to say, however, that when it appears from the pleadings or proofs that priority may not be adjudged to the applicant there is an obligation upon the court to consider questions of validity, except perhaps in the rare case where it is obvious on the face of the patent that the patent is invalid. The view that one who is not the first and true inventor and therefore not entitled to a patent, is precluded from challenging the validity of a patent granted to another, was clearly expressed by Mr. Chief Justice Taft when writing for this court in Christie v. Seybold, 6 Cir., 55 F. 69, and was followed by us in Cleveland Trust Co. v. Berry, 6 Cir., 99 F.2d 517, 521. Neither Willett Mfg. Co. v. Root Spring Scraper Co., 6 Cir., 55 F.2d 858, nor Mishawaka Rubber & W. Mfg. Co. v. Paine & Williams Co., 6 Cir., 139 F.2d 603, rightly considered, conflicts with it. In the Mishawaka case there were challenges to validity by both plaintiff and defendant, a counterclaim under the Declaratory Judgment Act, 28 U.S.C.A. §§ 2201, 2202, and a charge of infringement. It was therefore considered the better practice to decide the whole case by a consideration of the validity of the respective claims. In the Mishawaka case the Berry case is expressly distinguished.

It has undoubtedly sometimes been thought, perhaps without too careful consideration of the precise language of Hill v. Wooster, supra, that it is the duty of the court in all circumstances to consider the question of validity, as in Palmer Pneumatic Tire Co. v. Lozier, 6 Cir., 90 F. 732, where it was declared that the power of the court should not be "perverted to the determination of an unprofitable inquest as to who was the first discoverer of a nullity." The seeming eloquence of this observation may, with equal logic, be met by the view that a court should not be perverted by efforts to make a nullity of that which one has sought as a thing of value. As Judge Allen observed in the Berry case, Hill v. Wooster does not justify broadening the issues under § 4915 at the instance of one who may not receive a patent so as to make it the "practical equivalent of an infringement suit in which all the defenses known to the patent law may be brought forward." [99 F.2d 522].

We are not persuaded that the filing of the Soderquist disclaimer dedicated to the public any rights to sheer-stripping. When McNeil became convinced that the broader claims of Soderquist were derived from Kuhlke it was incumbent upon it to transfer such claims to the Kuhlke application. The intention to abandon an invention must be shown by express declaration or by necessary implication. Planning-Machine Co. v. Keith, 101 U.S. 479, 484, 25 L.Ed. 939. Every reasonable doubt relative to such question must be resolved in favor of the patent for the law does not favor forfeiture. Walker on Patents, Dellers Edition, § 99, p. 372. No evidence of such intention on the part of Soderquist is found in the record.

We have examined other grounds upon which the appeal is based. We find them without merit and not requiring discussion.

The decree below is affirmed.